**LATOOF et al. v. TEXAS & PAC. RY. CO.**

**No. 6079.**

Court of Appeal of Louisiana. Second Circuit.

April 4, 1940.

I. Abramson, of Shreveport, for appellants.

Wise, Randolph, Rendall & Freyer, of Shreveport, for appellee.

TALIAFERRO, Judge.

Mrs. Mary Latoof fell while in the act of alighting from defendant's train in the City of Shreveport, and sues for damages on account of the physical injuries sustained in and resulting from the fall. Her husband joined in the suit and sues for medical expenses incurred in treating her.

The negligence charged to defendant, to which the accident is accredited, is that after bringing the train to a stop to allow passengers to alight, it gave a "tremendous" jerk when and as plaintiff was in the act of descending the steps to the ground; that simultaneous with the jerk the heel of one of her shoes caught in the metal strip at the head of the steps, then in a defective condition, and that the two—the jerk and the fouled heel, together—caused her to lose balance and to fall down the steps.

Defendant's answer is a general denial. Plaintiffs' demands were rejected and they appealed.

For convenience, hereinafter Mrs. Latoof will be referred to as plaintiff.

Plaintiff boarded the train in Natchitoches, Louisiana, and arrived in Shreveport at 1 o'clock A. M. The train was backed into the station, as was the rule, and, after being brought to a dead stop, the brakeman entered the coach in which plaintiff was riding and announced "Shreveport", which was the signal for all passengers to get off. Plaintiff and the other passengers in that coach arose from their seats and proceeded toward and through the western exit of the coach to the platform. Two men passengers preceded her and safely descended the steps to

the ground platform, which runs parallel to the track. The identity of these two passengers is unknown to the parties to this suit. Immediately behind plaintiff was Jack Generose, her brother-in-law. Behind him was J. J. Greer. Both of these men testified in plaintiff's behalf. All of the train crew testified for defendant. The court specifically found for defendant on both elements of alleged neglect, to-wit: defective condition of the metal strip, and the jerking of the train.

In this court it is evident that appellants have abandoned the charge that the metal strip was in a defective condition, and, because of such condition, a contributing factor to the accident. The brief submitted in plaintiff's behalf omits reference to the strip. Obviously, to succeed, she relies exclusively upon the charge that the train "jerked" after having once stopped.

Plaintiff is positive her shoe's heel caught in the metal strip. Generose, who was between her and Greer, did not so testify. If such happened, he did not see it. Greer, notwithstanding that Generose was between him and plaintiff, is positive he saw the heel catch in the strip. He admits that he and Generose were conversing immediately prior to and at the time plaintiff fell. How he could have seen plaintiff's heel as and when it caught in the strip, if such happened, is beyond our understanding. We think it virtually impossible, under the circumstances, for him to have done so. The strip was in perfect physical and mechanical condition at the time. We make these observations here, notwithstanding appellant's abandonment of the contention that the strip's condition was defective, because, if plaintiff and Greer could be so patently in error on this score, surely they could be equally so as regards the train jerking.

We experience no difficulty, as seemingly was true of the lower court, in reaching the conclusion that the train did not move while the passengers were alighting. Anent this phase of the case we quote, with approval, the following fact findings of the trial judge, to-wit:

"The evidence shows that the train, as it arrives at the Union Depot, backs under the pick-up shed and is set out there. That before the train arrives at the stopping place, the engineer cuts off the steam and the train runs backward on its own momentum. The conductor is on the rear platform and regulates the speed of the train by means of a hand air brake. He applies the brake, as he slows the train, until he gets the train to the point he wants it to stop and then cuts off the air. He sets the brake and the train cannot thereafter be moved unless the engineer releases the brake. The engineer does not, in the ordinary course of the operation of the train, release the brake or move the train until the passengers are unloaded and the train is ready to be coupled into the sleeper.

"That, as the train moves into the depot, it stops at a switch and the brakeman opens the switch and catches the train near the front. He then goes to the back of the train to announce the station. After the train comes to a stop, he then opens the door for the passengers to alight."

Generose is positive the train jerked backward about 2 feet, however, he was not unbalanced thereby. Concerning the manner of plaintiff's fall, he says: "When I saw her she had just caught on the railing and I estimated that the jerk hit her back."

In this connection, it is well to keep in mind that this witness was only a few inches behind plaintiff. They and Greer were all in line on the narrow platform. The locus was well lighted.

Greer is also positive the train gave a "little jerk" and further says: "* * * and so she had gotten her heel in the top step and she got overbalanced, and it threw her out. She caught her arm in that little rail, I guess you would call it, coming up the steps and it jerked her to the ground."

He was not affected by the jerk, though he says the train went backward 3 or 4 feet.

Both Greer and Generose seek to bolster their testimony about the train "jerking" by adding that after the commotion they observed the step-box, which is generally placed on the ground at the steps for passengers to use in boarding or alighting, was 3 or 4 feet beyond the steps; that its then position was due to the train moving backward. In this respect, they are clearly proven to be wholly wrong. This box is not used at all at the Shreveport station. There is no need for so doing because the level of the ground platform is not over a foot from the coach's bottom step. The box's height, in inches is practically the same as the distance between the lower

654

step and the platform. The testimony is conclusive that the box was not placed on the platform at all the morning plaintiff fell. Had such been done, it would have been more of a hindrance than a help to passengers.

Plaintiff testified that her shoe caught in the brass strip across the platform and that she "started to fall and caught myself, with the handrail, and the train jerked and I lost my balance and fell." Amplifying, she adds, "I fell on my back, slid right down the steps."

The trial judge, in rejecting plaintiff's version of the facts about her fall, says:

"Plaintiff, Mrs. Latoof testified that in falling she injured her coccyx, and that a miscarriage subsequently resulted therefrom.

"The plaintiff does not argue the point about the metal strip in the brief. I think it is well to leave that out for the reason that if a person hangs her foot on a strip and falls, she must naturally fall forward and on to her face. Walking is merely a matter of falling forward, and being halted in the fall by stepping forward, and if the foot is hung, the body falls forward and the person would have fallen down the steps face forward. The fact that Mrs. Latoof's coccyx was injured indicates that her feet slipped out from under her on this step, her feet going first instead of her head. I do not think it is shown that her foot caught in this metal strip."

This reasoning is quite apt. Had plaintiff lost her balance, for the reasons she assigns, she would have fallen heavily forward and not backward.

On this phase of the facts we think the brakeman's testimony correct. He was standing on the ground platform at the left side of the steps, assisting passengers to alight. His attention was momentarily drawn to his left side. He turned his head in that direction to give a command to a negro porter and immediately resumed his former position. He then observed plaintiff sitting on the second step. She made no outcry at all, nor was she sobbing.

Whether plaintiff fell purposely or from her own carelessness is not necessary to determine. She evidently landed on her buttocks. This accounts for the alleged injury to the coccyx. This part of her anatomy could not have been hurt by falling forward.

No good purpose would be subserved by further summary of the testimony adduced in plaintiff's behalf. It does not impress us as being reasonable, but, on the contrary, has strong semblance of being partly, if not wholly, fabricated.

As affecting plaintiff's credibility, it is shown that a few years ago she had another accident while boarding a train, the facts of which are quite similar to those in the present instance. She claimed to have been seriously injured then, but settled for $40. She denied making a demand for damages in that case, but was proven to be in error.

It would require testimony of a very strong and positive character to convince us that after a train had been backed into a station to allow passengers to get off, as was done in this case, the engineer would, while such passengers were alighting, release the brakes and move the train. To do so, as the lower court remarked, would be worse than negligence, it would be criminal.

The train crew, consisting of engineer, conductor, brakeman and fireman, all testified that the train was slowly backed into the station, and did not move after coming to a stop. The engineer and conductor, on whom rests primarily the duty of "spotting" the train for passengers to alight, have been in defendant's services for over thirty years. They are positive that on the date plaintiff claims to have been injured, this train was handled in the regular and usual manner. We believe them.

Plaintiff strongly relies upon Wallace v. Shreveport Railways Company, La.App., 175 So. 86, in which this court held, inter alia:

"A prima facie case of negligence against street railroad was established by passenger's showing that she paid her fare and was injured while on car.

"The onus of proof, after a prima facie showing of negligence of street railroad in action against it by passenger, did not shift, but it then devolved on street railroad to adduce proof of lack of negligence on its part sufficient in probative weight to overcome passenger's case. * * *

"When it is proven that a passenger was injured by an instrumentality of the carrier, the presumption arises that the injury was due to the carrier's negligence."

The facts of that case are, in the main, dissimilar to those before us. There, only the plaintiff's testimony and that of the motorman was taken. No other persons had firsthand knowledge of the accident. We held that since the witnesses were of equal credibility, plaintiff should recover because her testimony was supported by the presumption of negligence on the part of the carrier which arose from the undenied fact that she was injured while riding as a paid passenger on the defendant's car. In that case, the defendant was unable to overcome the presumption which balanced the scales for plaintiff.

In the present case, defendant has conclusively exculpated itself from the inference of negligence which arose from the testimony on plaintiff's behalf.

The judgment appealed from is affirmed with costs.